[No. 23138-1-III.   Division Three.   June 16, 2005.]

MEREDITH CAMPBELL, *Appellant*, v. THE STATE OF WASHINGTON ET AL., *Respondents*.

*William J. Powell* and *Jodi M. Felice* (of *Powell Kuznetz & Parker, P.S.*), for appellant.

*Robert M. McKenna, Attorney General*, and *Paul J. Triesch* and *Catherine Hendricks, Assistants*, for respondents.

¶1 KATO, C.J. — Meredith Campbell began working as a custodian for Eastern Washington University (EWU) in 1999. In 2001, she became the secretary for EWU's Military Science Department. She received two negative evaluations and felt intimidated and harassed at work. After going on a stress-induced sick leave, Ms. Campbell was reverted by EWU to her former job as a custodian. She then filed an action against the State and two of her supervisors, alleging hostile work environment sexual harassment, retaliation, and constructive discharge. The State's motion for summary judgment dismissal was granted. Ms. Campbell appeals. We reverse the dismissal of the hostile work environment claim but affirm the trial court's decision in all other respects.

¶2 Ms. Campbell began working at EWU as a custodian in March 1999. She eventually became a permanent civil service employee.

¶3 In the fall of 2001, Ms. Campbell applied for a secretarial position. Human Resources referred her to EWU's Military Science Department. Ms. Campbell began working for the Department in September 2001.

¶4 The Military Science Department is part of the College of Social and Behavioral Sciences at EWU. The Reserve Officers Training Corps (ROTC) is implemented through the Department pursuant to federal regulations and a contract between the United States Army and EWU. The contract required EWU to establish the Military Science Department (Department) and adopt a course of military instruction. Major Leaf Rich and Lieutenant Colonel (Lt. Col.) Charles Green had faculty status at EWU. Lt. Col. Green was the Department chair. Both men were employed by the Army.

¶5 Under the contract, EWU had to approve the Army officers before they were assigned to the Department. EWU could also request their removal for cause. EWU was required to provide a secretary to the Department, without any expense to the Army.

¶6 When Ms. Campbell was hired, she was required to successfully complete a six-month trial period before becoming a permanent secretary. Shortly after she began working in the Department, Ms. Campbell heard Major Rich make derogatory comments about women, such as " 'women should stay home barefoot and make babies' " and " 'women are useless.' " Clerk's Papers (CP) at 559. The Major also told her to be more subdued and not so direct.

¶7 On January 4, 2002, Major Rich met with Ms. Campbell and critiqued her work performance. He told her to be more flexible and more aware of her impact on others. She also needed to increase her budget proficiency.

¶8 Also in January, Ms. Campbell was reprimanded for asking work study students not to remove items from her

desk. Lt. Col. Green said her " 'desk will be raped on a daily basis whether you like it or not.' " CP at 559. He also told her women should not work and men are the leaders of the family and women should obey them. Ms. Campbell found this behavior offensive.

¶9 Major Rich continued to tell Ms. Campbell to be more subdued and less direct with men. He also advised her to soften things up a bit and make small talk before getting down to business. He commented that she caught people off guard by walking up and talking to them because she was so small and fragile looking. He further told her other women on campus would be jealous of her because she was petite and had a good body. The Major said she would wear out her boyfriend unless she straightened out her personality.

¶10 On February 21, 2002, Major Rich sent an e-mail entitled "Don't Bother Me Button" to Ms. Campbell and the other members of the Department. CP at 559. The e-mail had a video attachment showing a log swinging violently from one side of the screen directly into a woman and forcibly removing her. In the body of the e-mail, the Major said it was "time to have a little fun with Meredith." CP at 559. He also said their superiors had authorized him to outfit their computers with this device just for Ms. Campbell.

¶11 On February 27, Lt. Col. Green sent an e-mail entitled "Our Work Environment" to Ms. Campbell and others in the Department. CP at 560. The message was in response to the Major's earlier e-mail to the Department that explained why alcohol should be served at work and also contained sexual references.

¶12 On March 1, the Major sent an e-mail entitled "Men and Women Switchboard" to Ms. Campbell and others. CP at 560. It implied women were impossible to figure out. Ms. Campbell was the only female recipient.

¶13 On March 5, the Major told Ms. Campbell women were supposed to be softer and friendlier. He said she was a " 'serious puss.' " CP at 560.

¶14 On March 7, Ms. Campbell received her three-month evaluation from Major Rich. He indicated that seven out of nine coworkers felt she was confrontational and students avoided her because she was negative and defensive. She was also expected to clean up the kitchen and common areas. When she objected this was not part of her job, she was told these types of chores were " 'women's work.' " CP at 560. Ms. Campbell provided a detailed response to this evaluation and gave her response to the Dean, two individuals in Human Resources, and her union representative.

¶15 There were several other incidents that made Ms. Campbell uncomfortable, including being yelled at, mocked, and ignored. On March 29, Ms. Campbell sent an e-mail to Human Resources, the Dean and his office staff, and her union representative stating she was in a hostile, accusatory, and harassing environment. She attached several e-mails, including the "Don't Bother Me Button" e-mail.

¶16 In April, Ms. Campbell met with the Dean, the Major, and Human Resources about her three-month evaluation. The Dean told the Major to revise the evaluation to be more in line with Ms. Campbell's job responsibilities.

¶17 Ms. Campbell sought help from ROTC headquarters in Fort Lewis, Washington. She was told to pursue her complaints with EWU.

¶18 On April 8, Ms. Campbell was leaving work when Major Rich blocked her from leaving. He demanded that she talk with him about her evaluation. She felt threatened. That same day, she had received her revised evaluation with five pages of negative comments about her performance.

¶19 On April 18, Ms. Campbell filed a formal complaint with EWU. She claimed Major Rich had turned on her and become extremely controlling, hostile, and unreasonable. An investigation found there were inappropriate and unprofessional actions on the part of Major Rich that should be addressed by his supervisor. The Dean found the situation serious but not irremediable.

¶20 On April 22, Ms. Campbell again contacted Fort Lewis because Major Rich continued to harass her. She also sent a copy of this e-mail to the president of EWU. Fort Lewis contacted Lt. Col. Green, asking if he had handled the situation. Lt. Col. Green ordered Ms. Campbell to remove her personal items from her desk.

¶21 On April 26, Ms. Campbell went on a stress-induced sick leave. In May, Lt. Col. Green gave her an unsatisfactory evaluation and recommended not retaining her in the Department. The evaluation contained input from others indicating Ms. Campbell was rude and difficult to work with. The Dean then reverted Ms. Campbell from her secretarial position to her prior custodial job.

¶22 Ms. Campbell appealed her reversion to the Personnel Appeals Board. She entered into a settlement with EWU prior to the hearing and was reinstated to the payroll on July 15, 2003. The settlement resolved all issues pertaining to her civil service appeal but did not affect any other claims she might have against EWU. She was assigned another secretarial position.

¶23 Ms. Campbell then filed suit against Major Rich, Lt. Col. Green, and EWU. She alleged hostile work environment sexual harassment, retaliation, and constructive discharge. The United States, on behalf of the officers, removed this action to federal court. The United States certified the officers had been acting within the scope of their federal employment and moved to substitute the United States as the proper defendant. It then moved to dismiss the complaint against the United States because there was no consent given for the suit. The federal court granted these motions. Ms. Campbell's claims against EWU were remanded to state court. EWU's motion for summary judgment was granted. This appeal follows.

¶24 Ms. Campbell claims the court erred in granting summary judgment dismissal. We conduct a de novo review of orders of summary judgment by engaging in the same inquiry as the trial court. *DeWater v. State*, 130 Wn.2d 128, 133, 921 P.2d 1059 (1996). Summary judgment is appropri-

ate if there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *Id.*

¶25 Ms. Campbell pleaded three claims against EWU, all of which were dismissed. The first was a hostile work environment claim. To establish this claim, "the employee must prove (1) the harassment was unwelcome, (2) . . . was because of sex, (3) . . . affected the terms or conditions of employment, and (4) . . . is imputed to the employer." *DeWater,* 130 Wn.2d at 135 (citing *Glasgow v. Ga.-Pac. Corp.,* 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)).

¶26 In order to constitute harassment, the conduct must be unwelcome. *Glasgow,* 103 Wn.2d at 406. Conduct is unwelcome if the plaintiff did not solicit or incite it. *Id.* The employee also must regard the conduct as offensive or undesirable. *Id.* Ms. Campbell described many incidents where Major Rich or Lt. Col. Green, without provocation, made comments or sent her e-mails she found offensive. Although failing to mention this to EWU in her response to her evaluations, what her true feelings were is a question of fact the jury should decide.

¶27 Ms. Campbell next had to establish that, had she been male, the harassment would not have occurred. *Id.* This element requires the gender of the plaintiff to be a motivating factor in the unlawful discrimination. *Id.* Much of the conduct Ms. Campbell complained of constituted derogatory comments about females. She presented sufficient evidence to raise a question of fact on this element as well.

¶28 The harassment had to be sufficiently pervasive so that it altered the conditions of employment and created an abusive working environment. *Id.* Ms. Campbell presented evidence she received offensive e-mails, such as the "Don't Bother Me Button" e-mail. They were sent to several people in the Department and specifically singled her out. There was also evidence Major Rich yelled at and mocked her in front of others. The harassment took place

over several months. The evidence is thus sufficient to raise a question of fact on this element.

¶29 The harassment must be imputed to the employer. For an employer to be responsible for the discriminatory work environment created by a plaintiff's supervisor, "the employee must show that the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407. This element can be established by showing that complaints were made to the employer and the employer's actions were not of such a nature to end the harassment. *Id.*

¶30 Ms. Campbell sent the Dean, Human Resources, and her union representative an e-mail explaining the harassing behavior. She attached several offensive e-mails the Major had sent her. On April 18, Ms. Campbell filed a formal complaint with EWU. An investigation found there were inappropriate and unprofessional actions that should be addressed by the Major's supervisor. The Dean also determined the situation was serious but not irremediable.

¶31 On April 22, Ms. Campbell sent an e-mail to Col. Lloyd Mues at Fort Lewis explaining the harassment she felt she had endured. She sent a copy of this e-mail to EWU's president. Col. Mues responded and indicated there appeared to be a problem.

¶32 This evidence was sufficient to raise a question of fact as to whether EWU knew, or should have known, of the harassment and that it was creating a hostile work environment. There is also evidence EWU did little to correct the situation. Whether EWU took reasonably prompt corrective action is a question of fact that should not have been resolved on summary judgment.

¶33 EWU counters that Ms. Campbell cannot prevail under the loaned or borrowed servant doctrine. This doctrine is a legal fiction which expands the concept of respondeat superior. *Stocker v. Shell Oil Co.*, 105 Wn.2d 546, 548, 716 P.2d 306 (1986). Under this doctrine, "a

worker in the general employ and pay of one person may be loaned or hired to another. When the worker undertakes the work of the other, the worker becomes the servant of the other for the particular transaction, and the general employer may escape liability for the worker's negligence." *Brown v. Labor Ready N.W., Inc.*, 113 Wn. App. 643, 647, 54 P.3d 166 (2002), *review denied*, 149 Wn.2d 1011 (2003). If the worker was a borrowed servant at the time of the transaction at issue, the servant's general employer can escape liability for damages. *Id.* The key factor is that the servant be in the exclusive control of the special employer at the time of the transaction. *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 258, 386 P.2d 958 (1963). Whether an employee qualifies as a loaned servant is generally a factual question. *Nyman v. MacRae Bros. Constr. Co.*, 69 Wn.2d 285, 288, 418 P.2d 253 (1966).

¶34  EWU argues Ms. Campbell was a borrowed servant. But there was evidence to suggest EWU still had some control over Ms. Campbell's employment as shown by its own investigation into her complaint and by the Dean's direction to the Major regarding her job description and evaluation. Viewing the evidence in a light most favorable to the nonmoving party, whether she was a borrowed servant is a question of fact for the jury to decide.

¶35  The court also granted summary judgment based upon *DeWater*, 130 Wn.2d 128. There, Ms. DeWater was employed by the State and worked in a foster home as a tracker. Claiming the foster parent harassed her, she sued the State for hostile work environment. The court upheld the summary judgment dismissal of her claim, finding the foster parent was an independent contractor of the State and the State was not vicariously liable for the actions of an independent contractor unless it retained the right to control the manner and means of work. *Id.* at 137-39. The court held the State had no right to control the daily actions of the foster parent or those working in the home. *Id.* at 140.

¶36  *DeWater* is distinguishable. EWU had some control over Ms. Campbell and the work environment. Whether it

was sufficient to trigger liability is a factual question for the jury to resolve.

¶37 Ms. Campbell raised questions of material fact as to her hostile work environment claim. The court erred by summarily dismissing it.

¶38 Ms. Campbell next contends the court erred by dismissing her retaliation claim. In order to establish a prima facie case of retaliatory discharge, Ms. Campbell must show she engaged in a statutorily protected activity, she was discharged or had some adverse employment action taken against her, and retaliation was a substantial motive behind the adverse employment action. *Kahn v. Salerno*, 90 Wn. App. 110, 128, 951 P.2d 321, *review denied*, 136 Wn.2d 1016 (1998). If Ms. Campbell can establish a prima facie case of retaliation, she also establishes a rebuttable presumption of discrimination. *Renz v. Spokane Eye Clinic, P.S.*, 114 Wn. App. 611, 618, 60 P.3d 106 (2002). The burden then shifts to the employer to produce admissible evidence of a legitimate reason for the discharge. *Id.* If the employer meets this burden of production, the burden shifts back to the employee to create a genuine issue of fact that the legitimate reason is merely a pretext. *Id.* at 619.

¶39 Ms. Campbell contends she was reverted to her position as a custodian because she filed a hostile work environment claim. She argues her action was a statutorily protected activity. We agree. *See id.* at 620.

¶40 She also must show that her complaint resulted in adverse employment action against her. *Id.* at 621. An adverse employment action involves "a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities' " such as reducing an employee's workload and pay. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004). A demotion or adverse transfer may also constitute an adverse employment action. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 74 n.24, 59 P.3d 611 (2002).

¶41 Ms. Campbell was reverted from her secretarial position to her former job as a custodian. While her

pay did not decrease, the reversion could be viewed as a demotion. Whether it was is for the jury to decide.

¶42 Ms. Campbell also must show retaliation was the motive behind the adverse employment action. Proximity in time between the adverse action and the protected activity, along with evidence of satisfactory work performance, suggests an improper motive. *Kahn*, 90 Wn. App. at 130-31. Ms. Campbell's reversion was close to the time she filed her complaint. This is sufficient to establish a prima facie case.

¶43 EWU argues it reverted Ms. Campbell because of her poor performance evaluations. There was evidence from coworkers, as well as her supervisors, indicating her performance was unsatisfactory. EWU thus established a legitimate reason for the reversion.

¶44 Ms. Campbell's attempt to establish the legitimate reasons given were merely a pretext must fail. Major Rich and Lt. Col Green were the supervisors accused of harassment. EWU reverted her based upon her poor evaluations. Ms. Campbell's complaint was against the Army officers, not EWU.

¶45 Ms. Campbell cannot meet her burden of establishing pretext. The court properly dismissed her claim.

¶46 Finally, Ms. Campbell claims the court erred by dismissing her claim for constructive discharge. To establish this claim, the employee must show (1) the employer deliberately made the working conditions intolerable for the employee, (2) a reasonable person would be forced to resign, (3) the employee resigned solely because of the intolerable conditions, and (4) the employee suffered damages. *Allstot v. Edwards*, 116 Wn. App. 424, 433, 65 P.3d 696, *review denied*, 150 Wn.2d 1016 (2003).

¶47 The issue is whether Ms. Campbell resigned. The proper focus of the inquiry is on whether the employee permanently left the job. *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 121 Wn. App. 295, 315, 88 P.3d 966 (2004).

¶48 Ms. Campbell permanently left her position as secretary for the Military Science Department; she did not leave the employment of EWU. She cannot establish a constructive discharge claim. The court properly granted summary judgment with respect to this claim.

¶49 EWU requests attorney fees pursuant to RCW 4.84.185 and RAP 18.1. Because EWU is not the prevailing party on all issues and it has not complied with RAP 18.1(b) in any event, we deny its request.

¶50 The summary judgment dismissal of the hostile work environment claim is reversed. The dismissal of the retaliation and constructive discharge claims is affirmed.

SCHULTHEIS and KURTZ, JJ., concur.

Review denied at 157 Wn.2d 1002 (2006).